[No. 10442. Department One. August 11, 1913.]

ANNA W. SPUTE, *Appellant,* v. ANDREW J. SPUTE, *Respondent.*[1]

DIVORCE—GROUNDS—RENDERING LIFE BURDENSOME—EVIDENCE—SUFFICIENCY. Under Rem. & Bal. Code, § 982, authorizing a divorce on any grounds deemed sufficient, where the court is satisfied that the parties can no longer live together, the denial of a divorce is unwarranted, where it appears that there is no love between the parties, the defendant's attitude toward his wife has been such as to make her life burdensome, and the parties agree that they can no longer live together, although there was no evidence of quarrels or temper or actual abusive treatment (MOUNT, J., dissenting).

DIVORCE—ALIMONY—RIGHT TO. The wife is entitled to alimony although all the property belonged to the husband at the time of the marriage.

Appeal from a judgment of the superior court for Kitsap county, Yakey, J., entered March 18, 1912, dismissing an action for a divorce, after a trial on the merits to the court. Reversed.

*Saunders & Nelson,* for appellant.

*Gill, Hoyt & Frye,* for respondent.

[1]Reported in 134 Pac. 175.

Chadwick, J.—Plaintiff and defendant were married at Denver, Colorado, in June, 1906. Plaintiff was twenty-one years old and defendant forty-two. Defendant had been married before. He had some mining property or prospects in Alaska, and the parties went to Nome, where they remained two seasons. In Alaska their life was harmonious. In 1908, they came to Seattle, and after a time spent at a hotel, defendant bought a small farm in Kitsap county. They then removed to the farm and raised fruit and chickens and other products of a small place. Defendant cleared up some of the uncleared land, which involved some extra work to the housekeeper. The work about the farm and household was about the same as that done by the small farmer and his family in the Puget Sound country. Plaintiff makes some objection to the burden of her work, but the objection goes not so much to the character or kind of work as to the fact that there was no sympathy between the parties and no approbation of her efforts, a thing which ofttimes lightens the burdens of both men and women. She says she liked the farm, and but for what she terms the cruelty of the defendant, would have been satisfied and content. The testimony shows throughout that plaintiff was unhappy and often in tears. She says defendant was abusive and cross, and at times called her names; that he objected to her having company; and it is not denied. that, during the whole time she was on the farm, he did not take her to visit any of the neighbors. The last year the parties lived on the farm, they did not live together as man and wife. Of his conduct, the several witnesses say:

"A. Very abusive, he abused her all the time I was there. . . . He was always very cross and called her names and made her feel bad every day, and several times she cried and would go away from the table, and he would make remarks to her. . . . Q. Did you notice Mr. Spute's conduct towards her and any effect it had on her, please state what. A. I don't know exactly how to answer that question. I never knew of him particularly abusing her, at the same time I never knew of him treating her kindly, he was always cross

and bluffing. I never knew him all the time I was around there as far as I can remember ever speaking kind words to the woman, never. Once I heard him scold her; I went down there to get some money and he went to get a pen and couldn't find it He laid it away and blamed her and scolded her quite severely for it; that is the only time I ever heard him come right out and scold her. . . . No, not absolutely cruel, he is a nervous man and speaks up quickly, and if any one would call that cruel, that is the way I would put it. . . And seen her other times when he was around and she would break down in tears, . . . At times Mr. Spute seemed to be nervous and cross and in a hurry."

The only witness who testifies to the question says that there was no quarreling between them, although he had seen "others get on better." Other neighbors say:

"Q. As far as seeing Mr. and Mrs. Spute together under social contact, you and Mrs. A. never really saw them together in that way? A. I do not know as we ever did. Q. Did you ever have occasion to know the conduct of Mr. Spute towards his wife? A. I never saw them together but once."

Plaintiff seems to have been an excellent housekeeper and a home-loving woman. Defendant was industrious and ambitious to make money. No aspersion of the character of either party can be found in the testimony. Plaintiff left her home on October 24, 1910, and went to Seattle, where she worked at the millinery trade and has since engaged in domestic service. On October 31, 1910, plaintiff wrote the letter which follows. We quote it in full because of the construction put upon it by counsel for the defendant and by the trial judge.

"Seattle, Wash., Oct. 31st, 1910.

"Dear Husband: Will write you a few lines to let you know if you should come in Saturday I suppose you will not find me at home. I will likely be up at the millinery shop. But you could call me up first at the house and find out. My telephone is Main 4356. The Sunset telephone. And if I should not be at home you could call at the Basquette Millinery Co., 617-18 Eitel building, cor. Second Ave. and Pike St. I do believe this is the first letter I ever got a chance to

write you. But I was afraid I would not get to see you when you come in Saturday. Sunday evening I attended services at Rev. J. D. O. Powers' church on 916 E. Mercer St. Miss Johnson is a member of his church. I enjoyed the services very much. You ought to come in Saturdays and stay over Sunday. You would not feel so lonesome. I don't see how I could stay so long on the ranch as I did, when I think of it. There is so much to go to here, and so much to learn. Like Rev. Powers said Who has ever loved knows all that life contains of sorrow and joy. I am afraid I will be going there right along. I do like so to hear him. I would not mind to have an apple now. The apples you buy are not very good. Must now close see you Saturday. Your wife, Anna."

The court denied plaintiff any relief, saying:

"I feel this way, that before the court would be authorized in granting a divorce in any case, the evidence ought to be to make it fairly certain that such a condition was existing to make it impossible for the people to live together. Our supreme court has held that incompatibility in temperament is not a ground for divorce. I cannot find that the evidence in this case would show where there is grounds for divorce. The whole trouble seems to be that the plaintiff wishes to live in Seattle rather than live on a farm. I sometimes wonder whether the courts can get at the real truth, and I don't know whether I have gotten at the real truth in this case. This husband may have been such that her life has been made a burden to her, but I cannot find it in this case. I don't believe there is a dozen families in Kitsap county where you could not make even a stronger showing than the wife has made in this case. While I don't believe in keeping people together where their lives would be ruined, but this woman is old enough to know what she is doing now, and if the reason why she wants a divorce is because she does not want to live on the farm, that is not grounds for divorce and I shall deny it."

It is true that this court and most others have said that a divorce will not be granted merely because the parties cannot live together. The term "incompatibility of temperament" cannot be accurately defined. No husband or wife

should be allowed to quit the domestic relation who is in fault, or because of those quarrels and displays of temper which are apt to occur between husband and wife where the spirit is balanced and neither is greatly dominant. But here there is no evidence of quarrel or temper. The parties have drifted apart, if indeed there was ever an actual understanding between them. There is no evidence of love, sympathy, or interest. Both agree that they will never live together as man and wife. The defendant says "probably not"; the record says in no uncertain tone that they never will. Much is made of that part of the letter quoted above which reads: "I don't see how I could stay so long on the ranch as I did, when I think of it. There is so much to go to here, and so much to learn." Counsel says, "Too many homes are broken up because the twentieth-century wife is not content with the comforts and small luxuries the husband can afford. The trial court could plainly see from her actions and testimony that all she cares for is whatever money she can get out of the defendant by divorce proceedings and freedom to live in the city."

We do not so read the letter. Plaintiff had no social life; she had never been taken to the neighbors or away from the farm, unless it was upon a business errand; she was offered no form of entertainment; she says, "I sometimes wondered if I was his wife or servant." The letter does not indicate, nor is there a scintilla of evidence to sustain the idea, that plaintiff is or ever intends to seek the lighter life of the city. If to go to church, to attend lectures, to be impressed as plaintiff seems to have been impressed, indicates a wanton disposition to abandon a proper home and seek other companions and other ways, we know not how a woman situate as was this plaintiff could sustain herself before the world. That she has loved defendant, the letter shows; there is a sympathy through it all. There is much meaning in the words: "I do believe this is the first letter I ever got a chance to write you." It shows that plaintiff had been denied much

that is essential to the feminine soul, and breathes a senti-
ment of rare refinement. The trial judge says: "I some-
times wonder whether the courts can get at the real truth
and I don't know whether I have gotten at the real truth in
this case." Rarely indeed is the whole truth spoken in di-
vorce cases, and it is perhaps as well that it is not; but, as
we read this record, the truth is not far concealed. The mar-
riage of a young woman, with her fresh ideals of the mar-
riage relation, to a man in middle life who has experienced
the romance of youth and from whose soul the sentiment of
that time has apparently passed forever, cannot bring en-
during happiness. The one is growing in health and spirit
and in aspiration; the other is content with the dead level
of every-day life and dull environment. There is nothing in
common between these two, and there never will be. Nature
has put a bar between them. Their venture has resulted, as
such ventures are most apt to result, in tragedy and shattered
hopes. The law provides for divorce. So long, then, as it
does, courts are bound to do that which will do the greater
justice to the parties and to society. These people will not
live together; their interest and the interest of society surely
will not be served by keeping them in bondage, one to the
other, and denying them freedom from a loveless marriage.

"It would be a mockery to speak of the relation as a mar-
riage. It was a marriage in name only. The substance was
entirely wanting. It is apparent from all the testimony that
the appellant had no love or affection for the cross-appel-
lant." *Gibson v. Gibson,* 67 Wash. 474, 122 Pac. 15.

Some men are satisfied in the domestic relation if they
have a woman in the kitchen. Some women are satisfied if
they have a roof over their heads, enough to eat, and some-
thing to wear. But the woman who is true to the instincts
of her sex must have love, or the marital relation is intoler-
able. With it, she will bear any burden, forgive any wrong
and her heart will be light through all misfortunes. Coun-
sels' conception of conjugal duty is wrong. It is true that

the record discloses no blows nor words that the law accepts as evidence of cruel treatment, but the utter indifference and cold neglect of a spouse may bruise harder than a blow and leave a sting sharper than words.

The law treats marriage as a civil contract; it relieves parties from improvident contracts and contracts where there is no consideration. The legislature has seen fit to say, after stating some special grounds for divorce, that "a divorce may be granted upon application of either party upon any other grounds deemed sufficient, and the court shall be satisfied that the parties can no longer live together." Rem. & Bal. Code, § 982 (P. C. 159 § 1). We have not overlooked the cases of *Bickford v. Bickford*, 57 Wash. 639, 107 Pac. 837; *Wheeler v. Wheeler*, 38 Wash. 491, 80 Pac. 762, and the later case of *Pierce v. Pierce*, 68 Wash. 415, 123 Pac. 598. These cases can be distinguished. In the *Bickford* case, we said:

"It is not enough that the record may convince the court that the parties can no longer live together. Some cause for that condition must be found, and the cause must not be brought about by the misconduct of the party seeking the divorce."

In the *Wheeler* case, it was held that there must be some cause shown from which the finding that the parties can no longer live together can be drawn. In the *Pierce* case, the respondent insisted that she was possessed of an affection for the appellant, ready to forgive and receive him back as her husband, and it was clear that respondent was entirely without fault. We find in this case that the parties have no love, one for the other, and that defendant's attitude toward his wife has been such as to make her life burdensome and entitle her to relief. If a divorce is not granted at this time, it seems certain that defendant will in due season bring an action against the plaintiff and be entitled to a decree upon the ground of desertion. It can make no difference upon what ground or to which party the divorce is granted. It is

enough if a divorce be granted at the suit of either party when they have submitted themselves to the jurisdiction of the court, and cause appears.

It is apparent from the record that defendant is possessed of some means. Perhaps all of it was his own at the time of the marriage, but plaintiff is entitled to some consideration. The judgment will be reversed and the cause remanded, with instructions to the lower court to enter a decree of divorce, and command defendant to pay to plaintiff the sum of $1,250; $500 ninety days after the remittitur goes down, $500 six months thereafter, and $250 as suit money and attorney's fees, 30 days after the remittitur goes down.

CROW, C. J., GOSE, and PARKER, JJ., concur.

MOUNT, J., dissents.